**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| TREEHOUSE FOODS, INC.; BAY VALLEY FOODS, LLC; FLAGSTONE FOODS, INC.; TREEHOUSE PRIVATE BRANDS, INC.; and LLOYD'S SYNDICATE CVS 1919, as subrogee of Treehouse Foods, Inc., | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | )    No. 18 C 1412 ) |
| SUNOPTA GRAINS AND FOODS INC., | )    Judge Rebecca R. Pallmeyer ) |
| Defendant. | ) |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs TreeHouse Foods, Inc. and affiliated entities (collectively, "TreeHouse") are producers, manufacturers, resellers, processors, and packagers of various food products in the United States. Defendant SunOpta Grains and Foods Inc. is a seller, distributor, manufacturer, supplier, and merchant of sunflower kernels. In May and June 2016, Defendant announced three recalls of sunflower kernels it had sold to TreeHouse after determining that they might be contaminated with listeria. In their First Amended Complaint, TreeHouse and its insurer, Plaintiff Lloyds Syndicate CVS 1919 ("Starr"), bring seven claims against Defendant in connection with the recalls, including claims for negligence (Count I), negligent misrepresentation (Count II), products liability (Count III), and contribution and indemnity (Count VII). Plaintiffs also assert claims for breach of contract and warranty based on the same underlying conduct. Before the court is Defendant's partial motion to dismiss Plaintiffs' tort claims, Counts I, II, and III, based on Illinois' economic loss doctrine, which bars recovery in tort for economic losses that stem from disappointed contractual or commercial expectations. *See Moorman Mfg. Co. v. Nat'l Tank Co.*, 91 Ill. 2d 69, 91, 435 N.E.2d 443, 452, 450, 61 Ill. Dec. 746, 756 (1982). Defendant also moves to dismiss Count VII, which seeks contribution and indemnity relating to the tort counts. For the

following reasons, Defendant's motion is granted.[1]  Plaintiffs' contract and warranty claims remain for decision.

## BACKGROUND

The following facts are taken from Plaintiffs' First Amended Complaint and recounted in the light most favorable to Plaintiffs.  *See Hutchison v. Fitzgerald Equip. Co.*, 910 F.3d 1016, 1025 (7th Cir. 2018).

### A.    The Parties

Plaintiffs TreeHouse Foods, Inc., Bay Valley Foods, LLC, and Flagstone Foods, Inc., are Delaware corporations with their principal places of business in Oak Brook, Illinois.  (Plaintiffs' First Amended Complaint [39] ("First Am. Compl."), ¶¶ 1-3.)  Plaintiff TreeHouse Private Brands, Inc., is a Missouri corporation with its principal place of business in Oak Brook, Illinois.  (*Id.* ¶ 4.)  TreeHouse purchases raw materials from suppliers and uses them to process and manufacture food products.  (*Id.* ¶ 8.)

Plaintiff Starr is an insurance underwriting entity with its principal place of business in the United Kingdom.  (*Id.* ¶ 5.)  It is authorized to issue insurance policies within the United States, including in Illinois.  (*Id.*)  Starr provided "Product Contamination Insurance" to TreeHouse effective June 27, 2015 to June 27, 2016.  (*Id.* ¶ 9; Ex. A to First Am. Compl. [39-1], 1.)

Defendant is a Minnesota corporation with its principal place of business in Minnesota. (*Id.* ¶ 6.)  As previously referenced, it manufactures and sells sunflower kernels.  (*Id.* ¶ 10.) TreeHouse purchased sunflower kernels from Defendant and used them "in its production of various food products."  (*Id.* ¶ 11.)

---

[1]    On October 9, 2018, after Defendant's motion to dismiss was fully briefed, Plaintiffs moved for leave to file a Second Amended Complaint.  Plaintiffs sought to modify the First Amended Complaint only by adding an additional breach of contract claim (Count VIII).  The court granted the motion.  The Second Amended Complaint is now the operative complaint in this action and, apart from Count VIII, is identical to the First Amended Complaint.  (*See* Plaintiffs' Second Amended Complaint [65] ("Second Am. Compl.").)  The court discusses the First Amended Complaint in this order.

**B.     The Sunflower Kernel Recalls**

On May 2, 2016, Defendant announced a voluntary recall of certain sunflower kernel products, including those it had sold to TreeHouse, "because of the presence of Listeria monocytogenes." (*Id.* ¶ 13.)[2] Listeria is an organism that "can cause serious and sometimes fatal infections" in humans; short-term symptoms like "high fever, severe headache, stiffness, nausea, abdominal pain and diarrhea"; and "miscarriages and stillbirths among pregnant women." (First Am. Compl. ¶ 14.) Defendant's initial recall covered sunflower kernels it had produced at its Crookston, Minnesota plant between February 1, 2016 and February 19, 2016. (*Id.* ¶ 13.) Defendant subsequently announced two expanded recalls: one on May 18, 2016 and another on June 1, 2016. (*Id.* ¶¶ 22-23.)[3] These recalls covered kernels Defendant had produced at the same plant on different dates. (*Id.*) In total, the recalls affected five million pounds of sunflower kernels that TreeHouse had purchased from Defendant. (*Id.* ¶ 24.)

**C.     Defendant's Pre-Recall Representations to TreeHouse**

Plaintiffs allege that, prior to the initial recall, Defendant made numerous representations to TreeHouse about the safety and quality of its sunflower kernels. First, Defendant stated that the kernels "were tested for microbial pathogens" and "produced Certificates of Analysis" stating that the kernels "were free of contaminants." (*Id.* ¶ 15.) Second, Defendant stated that the "oil

---

[2]     The court takes notice that in the recall announcement, which Plaintiffs attach to the First Amended Complaint, Defendant stated that it "voluntarily recall[ed]" the sunflower kernels due to "*potential*" listeria contamination. (*See* Ex. B to First Am. Compl. [39-2] ("May 3, 2016 Recall Notice"), 1 (emphasis added); *see also id.* at 2 ("We are aware of one customer complaint that did not involve an illness, and we are not aware of any consumer issues due to consumption of this product."); *Thompson v. Illinois Dep't of Prof'l Regulation*, 300 F.3d 750, 754 (7th Cir. 2002) (It is well-settled "that when a written instrument contradicts allegations in a complaint to which it is attached, *the exhibit trumps the allegations*").)

[3]     The court again takes notice that the expanded recall announcements refer only to "potential" listeria contamination. (*See* Ex. C to First Am. Compl. [39-3] ("May 18, 2016 Recall Notice"), 1; Ex. D to First Am. Compl. [39-4] ("June 1, 2016 Recall Notice"), 1.) The May 18, 2016 Recall Notice further states, "No illnesses have been confirmed related to the consumption of this product." *Id.* at 1. The June 1, 2016 Recall Notice similarly states, "No illnesses related to the consumption of these products have been confirmed." *Id.* at 1.

roasters in its Crookston, Minnesota plant were properly validated and acted as a certified 'kill step' in preventing microbial population and pathogen control." (*Id.* ¶ 16.) Defendant's representation in this regard was "based on testing [it] performed." (*Id.*) Third, Defendant "provided Specifications to its customers, including TreeHouse," that "contained microbial requirements" and "promised" that Defendant would manufacture its sunflower kernels "in accordance with . . . the Code of Federal Regulations, 21 C.F.R. § 110." (*Id.* ¶ 17.)

According to Plaintiffs, Defendant "was in the business of supplying health and safety information to its customers, including TreeHouse, along with its products . . . ." (*Id.* ¶ 18.) Obviously conscious of the "economic loss" doctrine (discussed below), Plaintiffs allege that the information Defendant provided to TreeHouse "was intended to be used by TreeHouse for guidance in its processing and use of [Defendant's] sunflower kernel products." (*Id.* ¶ 19; *see also id.* ¶ 20 (alleging that Defendant "provided information to TreeHouse based upon [its] own directions, specifications, processing facilities, cleaning, processes, equipment, testing, environmental controls and analysis intended to prevent the sale of harmful and unhealthy products").) In addition, Plaintiffs allege that Defendant knew or had reason to know "the purposes for which TreeHouse purchased [its] sunflower kernels." (*Id.* ¶ 25.) Defendant likewise knew or had reason to know "that TreeHouse relied on [it] to provide products and materials that were safe and fit" for human consumption. (*Id.* ¶ 26.) Plaintiffs allege that they "reasonably relied on" Defendant to supply sunflower kernels that met these standards. (*Id.* ¶ 27.) Yet Defendant, Plaintiffs allege, negligently misrepresented that the kernels "were free of contaminants that would cause serious and potential deadly health and safety problems" for consumers. (*Id.* ¶ 28.) TreeHouse, in turn, "reasonably relied on [those] misrepresentations." (*Id.* ¶ 29.)

## D.  The Alleged Contamination and Damage to TreeHouse Property

Plaintiffs allege that the "contamination to" the recalled sunflower kernels "occurred suddenly and immediately" when they came into contact with listeria. (*Id.* ¶ 31.) Plaintiffs also allege that the recalled kernels "were defective and in an unreasonably dangerous condition at

the time" Defendant delivered them to TreeHouse. (*Id.* ¶ 30.) "The contaminated and defective condition" of the recalled kernels, Plaintiffs allege, "created a dangerous, unhealthy, and potentially deadly characteristic of [those] kernel[s]." (*Id.* ¶ 34.)

Plaintiffs further allege that the "defective" kernels caused damage to property apart from the kernels. (*Id.* ¶ 35; *see also id.* ¶ 33.) First, TreeHouse incorporated the kernels into products that it "formulated, mixed, manufactured," and sold to customers. (*Id.* ¶ 36.) The kernels caused "sudden[] and immediate[]" damage to those products upon coming into contact with them. (*Id.* ¶ 32.) Second, when the kernels came into contact with TreeHouse's equipment and machinery (hereinafter "equipment"), they "suddenly and immediately" contaminated it. (*Id.* ¶ 38.) The equipment became "inherently dangerous" because it could contaminate "other raw materials and finished products processed in TreeHouse's facilities." (*Id.*) Third, TreeHouse used that equipment "to process various products that did not contain the contaminated . . . kernels." (*Id.* ¶ 39.) Those products were "suddenly and immediately" damaged when they had contact with the equipment. (*See id.* ¶¶ 32, 39.)

Plaintiffs allege that, due to the recalls, TreeHouse had to "destroy contaminated products in its possession, including contaminated sunflower kernels, finished products that incorporated the contaminated sunflower kernels, and finished products that were made on equipment that had been contaminated by [Defendant's] sunflower kernels." (*Id.* ¶ 40.) In addition, TreeHouse had to recall products from customers; destroy them; and provide "credit memos and discounts." (*Id.*) Finally, TreeHouse "incur[red] extra expenses and business interruption losses." (*Id.*)

The product contamination insurance that TreeHouse obtained from Starr covered "losses sustained by TreeHouse as a result of SunOpta's recalls." (*Id.* ¶ 41.) TreeHouse has made a $16,165,000 claim on the policy, and, to date, Starr has paid $8,000,000. (*Id.* ¶ 42.) Plaintiff alleges that "Starr is legally, equitably, and contractually subrogated to claims against third parties responsible for the damages, including" Defendant. (*Id.* ¶ 43.)

### E.    Plaintiffs' Claims

In Counts I, II, and III of their First Amended Complaint, Plaintiffs assert claims for negligence, negligent misrepresentation, and products liability, respectively.  In Count IV, Plaintiffs assert a claim for "breach of contract/breach of express warranty/indemnity."  (*Id.* ¶ 65.)  As part of that claim, Plaintiffs allege that Defendant "agreed to defend, indemnify, and hold harmless TreeHouse . . . against all damages, liabilities, claims, losses and expenses . . . resulting in any way from, any act or omission of" Defendant, its agents, or its contractors.  (*Id.* ¶ 68.)  In Count V, Plaintiffs assert a claim for breach of implied warranty of fitness for a particular purpose, and in Count VI, Plaintiffs assert a claim for breach of implied warranty of merchantability.  Finally, in Count VII, Plaintiffs assert a claim for "contribution and indemnity" arising from Defendant's acts and omissions set forth in Counts I through V.  (*Id.* ¶¶ 82-86.)  Plaintiffs seek $16,165,000 in damages together with interest, costs, and such other relief as the court deems appropriate.

## LEGAL STANDARD

The court has diversity jurisdiction and the parties agree that Illinois law applies to Plaintiffs' claims.

A Rule 12(b)(6) motion challenges the sufficiency of the complaint.  *See, e.g.*, *Camasta v. Jos A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014); FED. R. CIV. P. 12(b)(6).  To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In assessing a Rule 12(b)(6) motion, the court accepts all well-pleaded facts in the complaint as true and draws all reasonable inferences in the plaintiff's favor.  *Hutchison*, 910 F.3d at 1025.

## DISCUSSION

**A.  Negligence and Products Liability (Counts I and III)**

In Counts I and III of their First Amended Complaint, Plaintiffs assert claims for negligence and products liability.  Through these claims, Plaintiffs appear to seek reimbursement for the recalled sunflower kernels themselves.  They also seek damages stemming from alleged harm that the recalled kernels caused to (1) finished products that incorporated the kernels; (2) TreeHouse equipment; (3) raw materials that touched the equipment; and (4) finished products that did not incorporate the kernels, but that touched the equipment.  Plaintiffs do not allege the contamination caused physical injuries to TreeHouse employees, customers, or anyone else.  Defendant argues that the economic loss doctrine, which the Illinois Supreme Court articulated in *Moorman*, 91 Ill. 2d at 91, 435 N.E.2d at 452, 450, 61 Ill. Dec. at 756, bars Plaintiffs' claims.  The court agrees.

The economic loss doctrine limits the recovery available to a plaintiff under certain tort theories; specifically, a "plaintiff cannot recover for solely economic loss under the tort theories of strict liability, negligence and innocent misrepresentation." *Moorman*, 91 Ill. 2d at 91, 435 N.E.2d at 452, 450, 61 Ill. Dec. at 756; *see also, e.g.*, *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 416, 821 N.E.2d 1099, 1139, 290 Ill. Dec. 525, 565 (2004) ("*Beretta*"); *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 692-93 (7th Cir. 2011).  "Economic loss has been defined as damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property . . . ." *Moorman*, 91 Ill. 2d at 82, 435 N.E.2d at 449; 61 Ill. Dec. at 752 (internal quotation marks omitted).  It can also be expressed as "the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold." *Id.* (internal quotation marks omitted).

The economic loss doctrine is based "upon the theory that tort law affords a remedy for losses occasioned by personal injuries or damage to one's property, but contract law and the

Uniform Commercial Code offer the appropriate remedy for economic losses occasioned by diminished commercial expectations not coupled with injury to person or property." *In re Illinois Bell Switching Station Litig.*, 161 Ill. 2d 233, 241, 204 Ill. Dec. 216, 220, 641 N.E.2d 440, 444 (1994). As the Illinois Supreme Court stated in *Moorman*,

> [T]he essence of a product liability tort case is not that the plaintiff failed to receive the quality of product he expected, but that the plaintiff has been exposed, through a hazardous product, to an unreasonable risk of injury to his person or property. On the other hand, contract law, which protects expectation interests, provides the proper standard when a qualitative defect is involved, i.e., when a product is unfit for its intended use.

91 Ill. 2d at 81, 435 N.E.2d at 448, 61 Ill. Dec. at 751. "[T]he proper test for distinguishing tort and contract is (1) the nature of the defect and (2) the manner in which the injury occurred." *Trans States Airlines v. Pratt & Whitney Canada, Inc.*, 177 Ill. 2d 21, 34-35, 682 N.E.2d 45, 51, 224 Ill. Dec. 484, 490 (1997). To recover in tort, "there must be a showing of harm above and beyond disappointed expectations." *Redarowicz v. Ohlendorf*, 92 Ill. 2d 171, 177, 441 N.E.2d 324, 327, 65 Ill. Dec. 411, 414 (1982); *see also Catalan*, 629 F.3d at 693 ("[T]he economic loss doctrine . . . bars tort recovery for purely economic losses based on failure to perform contractual obligations.").

There are, however, three exceptions to the economic loss doctrine:

> (1) where the plaintiff sustains damage, *i.e.,* personal injury or property damage, *resulting from a sudden or dangerous occurrence;* (2) where the plaintiff's damages are proximately caused by a defendant's intentional, false representation; and (3) where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions.

*Trans States Airlines*, 177 Ill. 2d at 26, 682 N.E. 2d at 48, 224 Ill. Dec. at 487 (quoting *In re Chicago Flood Litig.*, 176 Ill. 2d 179, 199, 680 N.E.2d 265, 275, 223 Ill. Dec. 532, 542 (1997)). "These exceptions have in common the existence of an extra-contractual duty between the parties, giving rise to a cause of action in tort separate from one based on the contract itself." *Catalan*, 629 F.3d at 693; *see also 2314 Lincoln Park West Condominium Ass'n v. Mann, Gin,*

*Ebel & Frazier, Ltd.*, 136 Ill. 2d 302, 314, 555 N.E.2d 346, 351, 144 Ill. Dec. 227, 232 (1990) ("[T]he concept of duty is at the heart of the distinction drawn by the economic loss rule.").

Here, Plaintiffs allege that TreeHouse and Defendant are commercial entities that contracted for the purchase and sale of sunflower kernels. (*See, e.g.*, First Am. Compl. ¶¶ 8, 44, 66-81.) It is undisputed that the UCC governed their transactions. (*See* Defendant's Memorandum in Support of Motion to Dismiss [42] ("Def's. Br."), 4; *see generally* Plaintiffs' Opposition to Defendant's Motion to Dismiss [48] ("Pls.' Opp.").) Plaintiffs allege that, in these transactions, Defendant made express and implied warranties about the safety and quality of its sunflower kernels. According to Plaintiffs, all of the losses TreeHouse suffered were "due to [Defendant's] recalls" of the kernels. (First Am. Compl. ¶ 40.) Defendant argues that in essence, Plaintiffs are claiming the kernels they purchased "did not meet the quality standards they bargained for." (Defendant's Reply in Support of Motion to Dismiss [50] ("Def.'s Reply"), 3.) Accordingly, Defendant contends, the economic loss doctrine bars Plaintiffs from recovering in tort. In response, Plaintiffs argue that their claims meet the first exception to the economic loss doctrine. As the court will discuss now, it disagrees.

An exception to the economic loss rule applies when "the plaintiff sustained personal injury or property damage resulting from a sudden or dangerous occurrence." *In re Chicago Flood*, 176 Ill. 2d at 200, 680 N.E.2d at 275, 223 Ill. Dec. at 542. As the Illinois Supreme Court has explained, "[c]ourts do not speak of a calamitous, sudden, or dangerous event or occurrence to avoid the economic loss rule, but rather to distinguish tort damages from mere economic loss." *Id.* A calamitous event "by itself," therefore, "does not constitute an exception to the economic loss rule." *Id.* Rather, there must be "a sudden, dangerous, or calamitous event *coupled with* personal injury or property damage." *Id.*

### 1. The "Occurrence"

Courts have defined a sudden or dangerous occurrence as "a sudden event, consistent with a tortious act," that is "highly dangerous and presents the likelihood of personal injury or

injury to other property." *Mars, Inc. v. Heritage Builders of Effingham, Inc.*, 327 Ill. App. 3d 346, 353, 763 N.E.2d 428, 435-36, 261 Ill. Dec. 458,465-66 (4th Dist. 2002). In assessing whether an event is "sudden," a court must "look to the suddenness of the *occurrence of an event*," *i.e.*, "the point when the injury occurs," "rather than the suddenness or length of time within which the *defect or cause of the occurrence* develops . . . ." *United Air Lines, Inc. v. CEI Indus. of Illinois, Inc.*, 148 Ill. App. 3d 322, 339, 499 N.E.2d 558, 562, 102 Ill. Dec. 1, 5 (1st Dist.1986).

Plaintiffs allege that when listeria touched the sunflower kernels, TreeHouse equipment, raw materials, and finished products, it "suddenly and immediately" contaminated them. (*See* First Am. Compl. ¶¶ 31-32, 38.) Plaintiffs further allege that listeria is dangerous to human health. In Plaintiffs' view, therefore, they have sufficiently alleged a sudden and dangerous occurrence. (*See* Pls.' Opp. 2-3 & n.4.) Defendant disagrees. It argues that unlike events such as fires, floods, explosions, and building collapses, contamination occurs gradually. (*See* Def.'s Mot. 8-9; Def.'s Reply 5 (citing *Loman v. Freeman*, 229 Ill. 2d 104, 110, 890 N.E.2d 446, 452, 321 Ill. Dec. 724, 730 (2008) ("This court had in mind fires, explosions, or other calamitous occurrences due to the failure of a product and the resulting risk of harm to persons or property.")).) Defendant also emphasizes that it recalled the sunflower kernels only due to *potential* contamination. (*See, e.g.*, Def.'s Br. 10.) Accordingly, Defendant contends, "the exact moment of contamination, if it existed, is not defined" (Def.'s Br. 10)—meaning that the court cannot assess "the point at which the injury occurred" to determine whether the event was sudden and dangerous. *United Air Lines*, 148 Ill. App. 3d at 339, 499 N.E.2d at 562, 102 Ill. Dec. at 5. Defendant also argues that "mere allegations of increased risk of personal injury are too speculative to support this exception." (Def.'s Br. 10.) And Defendant states that contamination cases rarely qualify for the exception. (*See id.* (citing *Am. United Logistics, Inc. v. Catellus Dev. Corp.*, 319 F.3d 921, 927-28 (7th Cir. 2003)).)

On the question whether contamination is properly characterized as "sudden," both parties' positions find some support in the case law. *See Muirfield Village-Vernon Hills, LLC v. K. Reinke, Jr. & Co.*, 349 Ill. App. 3d 178, 194, 810 N.E.2d 235, 249, 284 Ill. Dec. 582, 596 (2nd Dist.

2004) (although "mold and bacterial infestation grew gradually," its "manifestation was sudden and calamitous, damaging [plaintiffs'] personal property and requiring them to flee their house or experience the likelihood of personal injury"); *Blommer Chocolate Co. v. Bongards Creameries, Inc.*, 635 F. Supp. 911, 916-17 (N.D. Ill. 1985) (reaffirming prior determination that contamination of chocolate and "processing facilities" with salmonella-infected whey "may be analogized to a sudden and calamitous occurrence caused by a defective product");[4] *compare Bd. of Educ. of City of Chicago v. A, C & S, Inc.*, 131 Ill. 2d 428, 446, 450, 546 N.E.2d 580, 588, 590, 137 Ill. Dec. 635, 643, 645 (1989) ("*A, C & S*") (stating that it may be "artificial" to characterize asbestos contamination as "sudden"); *Dixie-Portland Flour Mills, Inc. v. Nation Enters., Inc.*, 613 F. Supp. 985, 986, 989 (N.D. Ill. 1985) ("[T]he cause of [plaintiff's] harm"—flour contaminated with sand, which plaintiff mixed into pizza dough—"was not sudden *or* dangerous" (emphasis added)).

Another close question is whether contamination is considered "dangerous" for purposes of the exception where, as here, plaintiffs allege only that it poses a *risk* of harm. On its face, *American United Logistics* appears to answer this question in the affirmative. There, the Seventh Circuit stated that "[i]n contamination cases, Illinois courts have generally rejected the application of the sudden or calamitous occurrence exception, unless the defect makes the product hazardous or unreasonably dangerous." 319 F.3d at 927. "Loss from contamination is recoverable notwithstanding the economic loss rule," the court continued, "if the product becomes inherently and unreasonably dangerous." *Id.* at 928 (citing *A, C & S, Inc.*, 131 Ill. 2d at 446, 450, 546 N.E.2d at 588, 590, 137 Ill. Dec. at 643, 645; *Blommer*, 635 F. Supp. at 916-17). The plaintiff in *American United Logistics* was a snack producer (Nabisco) that leased a warehouse to store its packaged food products. 319 F.3d at 923. Chemical residues from the warehouse contaminated the products. *Id.* Although the contamination made the products "unfit for sale," Nabisco alleged that it "*did not* pose a health risk." *Id.* at 928. The Seventh Circuit determined

---

[4] The earlier decision is *Blommer Chocolate Co. v. Bongards Creameries, Inc.*, No. 83 C 0536, 1984 WL 454 (N.D. Ill. Apr. 11, 1984).

that, "[g]iven this allegation, Nabisco could not plead any facts that would support a finding that the contamination of its products meets the requirements for the application of the" exception. *Id.*

Plaintiffs argue that because they allege listeria contamination is "inherently dangerous to human health," they supply the criteria that was lacking in *American United Logistics*. (Pls.' Opp. 7; *see also id.* at 5 (stating that because TreeHouse had already placed "a significant portion of the contaminated" kernels "into the stream of commerce . . . at the time of the recalls[,] . . . the risks presented by the listeria contamination were real, not hypothetical").) Defendants, on the other hand, point to *1324 Pratt Condominium Association v. Platt Construction Group, Inc.*, in which a court assessing the "sudden or dangerous occurrence" exception in a mold infestation case determined that "speculative allegation[s]" concerning an "increased risk of serious personal injury," without "allegations of any actual injuries," were "insufficient to sustain a cause of action in tort." 404 Ill. App. 3d 611, 620, 936 N.E.2d 1093, 1101, 344 Ill. Dec. 336, 344 (1st Dist. 2010). (*See* Def.'s Reply 11.) The court also notes that when the Seventh Circuit stated that plaintiffs can recover for contamination-related loss "if the product becomes inherently and unreasonably dangerous," it relied on two cases in which there was evidence of actual contamination. *See Am. United Logistics*, 319 F.3d at 928 (citing *A, C, & S*, 131 Ill. 2d at 449, 546 N.E.2d at 590, 137 Ill. Dec. at 645 (asbestos contamination); *Blommer*, 635 F. Supp. at 914 (salmonella contamination)).

The court concludes that in the present case, it need not decide whether the alleged contamination was "sudden" for purposes of the exception, nor whether mere allegations of risk plead the requisite "danger." Reaching these issues is unnecessary because, as previously referenced, Plaintiffs must allege a sudden and dangerous event "*coupled with*" personal injury or damage to "other property." *In re Chicago Flood*, 176 Ill. 2d at 200, 680 N.E.2d at 275, 223 Ill. Dec. at 542; *see Mars, Inc.*, 327 Ill. App. 3d at 353, 763 N.E.2d at 435-36, 261 Ill. Dec. at 465-66. For the reasons discussed below, Plaintiffs fail to do so.

Before turning to that discussion, the court notes Plaintiffs' apparent contention that allegations of contamination-related health risks are, by themselves, sufficient to meet the

"sudden or dangerous occurrence" exception.  (*See* Pls.' Opp. 6 (arguing that the Seventh Circuit's decision in *American United Logistics* "confirms that the *Moorman* exception for sudden and calamitous occurrences is *satisfied* when the contaminated product poses a health risk" (emphasis added)).)  The court does not agree with this interpretation of *American United Logistics*.

The Seventh Circuit, for example, never stated that if Nabisco *had* alleged that the contamination posed a health risk, it would *not* have needed to plead that the contamination damaged "other property."  *See* 319 F.3d at 923-28.  Exempting Nabisco from that requirement would have directly contradicted settled Illinois law.  *See, e.g.*, *In re Chicago Flood*, 176 Ill. 2d at 200, 680 N.E.2d at 275, 223 Ill. Dec. at 542.  The Seventh Circuit did not discuss "other property" damage, but it did not need to reach the issue.  Additionally, in stating that plaintiffs can recover for contamination-related loss "if the product becomes inherently and unreasonably dangerous," the Seventh Circuit relied on the Illinois Supreme Court's decision in *A, C & S*.  *See Am. United Logistics*, 319 F.3d at 928.  There, the court determined that although "asbestos damages" did not "easily fit within the framework delineating tort and contract," plaintiffs could recover in strict liability and negligence because asbestos is inherently and unreasonably dangerous; it was present in plaintiffs' buildings; and it caused damage to the buildings.  131 Ill. 2d at 445-46, 450, 546 N.E.2d at 588, 590, 137 Ill. Dec. at 643, 645.  The court was careful to confine its decision to the facts:  it cautioned that the holding "should not be construed as an invitation to bring economic loss contract actions within the sphere of tort law through the use of some fictional property damage."  131 Ill. 2d at 445, 546 N.E.2d at 588, 137 Ill. Dec. at 643.  In addition, the court stated that "risk alone" is not an "element of inquiry" in drawing the line between tort and contract.  131 Ill. 2d at 442, 546 N.E.2d at 587, 137 Ill. Dec. at 642.  More recently—and after the Seventh Circuit issued its decision in *American United Logistics*—the Illinois Supreme Court rejected an argument that *A, C & S* "creat[ed] an exception to the *Moorman* doctrine whenever it is alleged that a defendant's conduct creates an unreasonable threat to public health, safety, and welfare."

*Beretta*, 213 Ill. 2d at 419, 821 N.E.2d at 1141, 290 Ill. Dec. at 567 (internal quotation marks omitted). For these reasons, the court declines to adopt Plaintiffs' broad reading of *American United Logistics*.

Plaintiffs cite several other cases that they contend support their interpretation. (Pls.' Opp. 4.) Among them is *Blommer*, which the Seventh Circuit cited in *American United Logistics* along with *A, C & S. See Am. United Logistics*, 319 F.3d at 928. But like the Seventh Circuit, the court in *Blommer* did not hold that allegations of risk extinguish the obligation to plead "other property" damage. The court notes, too, that *Blommer* was also decided before the Illinois Supreme Court clarified that an allegation concerning a calamitous event is, on its own, insufficient to bring a claim within the *Moorman* exception at issue. *See In re Chicago Flood*, 176 Ill. 2d at 200, 680 N.E.2d at 275, 223 Ill. Dec. at 542. The court in *Grand Pier Center LLC v. Tronox, LLC*, No. 03 C 7767, 2008 WL 4776174 (N.D. Ill. Oct. 31, 2008), relied only on *American United Logistics* in concluding that a reasonable jury could find that "radioactive waste contamination presented health risks and therefore falls within the [*Moorman*] exception." *Id.* at *5; *see* Pls.' Opp. 4. Moreover, although the court did not squarely address the "other property" requirement, there was evidence of actual contamination in plaintiff's soil. 2008 WL 4776174, at *2. Thus, *Grand Pier* can reasonably be interpreted as concluding that, viewing the evidence in the light most favorable to plaintiff, the "other property" requirement could be satisfied. In the remaining cases Plaintiffs cite, there were allegations of actual damage to "other property." *See In re StarLink Corn Products Liability Litigation*, 212 F. Supp. 2d 828, 842 (N.D. Ill. 2002) (plaintiffs' corn crop destroyed by "wholly external" contaminant); *Vesta Farm, LLC v. Purina Animal Nutrition, LLC*, Case No. 17-cv-0303-MJR-SCW, 2017 WL 4472784, at *1 (S.D. Ill. Oct. 6, 2017) (defective fish food killed plaintiff's largemouth bass in significant numbers); *Mercury Skyline Yacht Charters v. Dave Matthews Band, Inc.*, No. 05 C 1698, 2005 WL 3159680, at *1-2 (N.D. Ill. Nov. 22, 2005) (human waste released onto plaintiff's boat).

To summarize, the court will assume for the sake of argument that Plaintiffs have adequately alleged that the listeria contamination was a sudden or dangerous event. As discussed below, this assumption does not change the result because Plaintiffs do not sufficiently allege damage to "other property."

### 2. Damage to "Other Property"

Property damage for purposes of the "sudden or dangerous occurrence" exception must be extrinsic to the defective product itself. *See Moorman*, 91 Ill. 2d at 86, 435 N.E.2d at 450, 61 Ill. Dec. at 753; *see also, e.g.*, *Trans States Airlines*, 177 Ill. 2d at 41, 682 N.E.2d at 53, 224 Ill. Dec. at 493; *Westfield Ins. Co. v. Birkey's Farm Store, Inc.*, 399 Ill. App. 3d 219, 232, 924 N.E.2d 1231, 1243, 338 Ill. Dec. 705, 717 (3rd Dist. 2010); *Mars, Inc.*, 327 Ill. App. 3d at 354, 763 N.E.2d at 436, 261 Ill. Dec. at 466. Accordingly, allegations that listeria contaminated only the sunflower kernels are insufficient. Plaintiffs contend that the following items, which the kernels damaged, are "other property": (1) finished products that incorporated the kernels; (2) TreeHouse equipment; (3) finished products that did not incorporate the kernels; and (4) unspecified raw materials.

In determining whether "other property," as opposed to the product itself, was damaged, Illinois courts apply a "bargained-for" approach. *Westfield*, 399 Ill. App. 3d at 232, 924 N.E.2d at 1243, 338 Ill. Dec. at 717 (citing *Trans States Airlines*, 177 Ill. 2d at 49, 682 N.E.2d at 57-58, 224 Ill. Dec. at 496-97); *Mars, Inc.*, 327 Ill. App. 3d at 355-56, 763 N.E.2d at 438, 261 Ill. Dec. at 468. "The relevant inquiry is, What is the object of the contract or bargain that governs the rights of the parties?" *Trans States Airlines*, 177 Ill. 2d at 50, 682 N.E.2d at 58, 224 Ill. Dec. at 497. For example, "[a] product and one of its component parts may constitute two separate products," but "if the parties bargained for a fully integrated product, the product and the component part constitute one product and the economic loss doctrine bars any recovery in tort for the damage to that product." *Westfield*, 399 Ill. App. 3d at 232, 924 N.E.2d at 1243, 338 Ill. Dec. at 717 (citing *Trans States Airlines*, 177 Ill. 2d at 49-50, 682 N.E.2d at 58-59, 224 Ill. Dec. at 497-98).

Applying these principles to the facts at hand, the court cannot agree with Plaintiffs that they have alleged damage to "other property." Certainly, TreeHouse "bargained" with Defendant to purchase sunflower kernels—not finished products, machinery, or other raw materials. In this sense, Plaintiffs did not bargain for an "integrated" product. *Compare Trans States Airlines*, 177 Ill. 2d at 50, 682 N.E.2d at 58, 224 Ill. Dec. at 497 (concluding from the terms of a sublease agreement that "[p]laintiff did not bargain separately for an engine and separately for an airframe," but rather for "a fully integrated aircraft"). Plaintiffs, however, allege that Defendant "knew or had reason to know the purposes for which TreeHouse purchased" the kernels: to use them "in its production of various food products." (First Am. Compl. ¶¶ 11, 25.) Furthermore, in the purchase orders it submitted to Defendant, TreeHouse required Defendant to warrant that the sunflower kernels would, among other things, "[b]e safe and fit for the ordinary purposes for which the kernels are used and for which TreeHouse intended." (*Id.* ¶ 66.) And TreeHouse obtained an agreement that Defendant would "defend, indemnify, and hold harmless TreeHouse . . . against all damages, liabilities, claims, losses, and expenses . . . resulting in any way from[] any act or omission of" Defendant or its agents. (*Id.* ¶ 68.) Considering the terms of these agreements, the court is satisfied that their object is to protect not only the quality of the sunflower kernels, but also to protect TreeHouse in its intended use of the kernels. *Trans States Airlines*, 177 Ill. 2d at 50, 682 N.E.2d at 58, 224 Ill. Dec. at 497. The damage to finished products, equipment, and raw materials, therefore, arose from "disappointed expectations" of a commercial bargain and cannot be recovered in tort. *Moorman*, 91 Ill. 2d at 85, 435 N.E.2d at 450, 61 Ill. Dec. at 753.

Several cases concerning products that plaintiffs purchased to use with or incorporate into other products—and that proved to be defective—provide additional support for this conclusion. For example, in *In re StarLink*, the court determined that plaintiffs could recover in tort where their crops "were contaminated by pollen from [defective] corn on a neighboring farm" because the "contaminant was wholly external." 212 F. Supp. 2d at 842. The court noted that if plaintiffs had "unknowingly purchased seed containing the" defect, mixed it with the rest of their crop, and

thereby contaminated the entire crop, the "situation would [have] fall[en] within the economic loss doctrine." *Id.* Plaintiffs in the latter scenario, the court added, "could have negotiated contractual protection from their suppliers and simply did not get what they bargained for." *Id.*

*Hecktman v. Pacific Indemnity Co.*, a case cited by neither party, is in accord. 2016 IL App (1st) 151459 ¶¶ 3, 5, 59 N.E.3d 868, 870-71, 406 Ill. Dec. 90, 92-93. There, plaintiffs purchased a condominium unit from defendants and then hired a third party to install hardwood floors. *See id.* Plaintiffs alleged that inadequate construction of a wall and inadequate installation of a heating, ventilation, and air conditioning (HVAC) system caused water infiltration in the condominium. *See id.* The court rejected plaintiffs' argument that water damage to the hardwood floor was "other property" damage. *See id.* ¶ 22, 59 N.E.3d at 876, 406 Ill. Dec. at 98. Rather, the court found, the damage was "consequent to any alleged qualitative defects to the" wall and HVAC systems, and was "not recoverable in tort." *Id.*

A close parallel to the present case is *Medefil, Inc. v. Scientific Protein Laboratories*, No. 13-cv-4773, 2015 WL 3962820 (N.D. Ill. June 26, 2015). Plaintiff in *Medefil* was a manufacturer of pre-packaged syringes. *Id.* at *1. Defendants supplied Heparin Sodium USP, which Plaintiff used as the active pharmaceutical ingredient in the syringes. *Id.* "Each shipment included" a certification that the heparin had been laboratory-tested. *Id.* "Due to the presence of a contaminant," Defendants voluntarily recalled a batch of heparin. *Id.* at *2. Plaintiff had already incorporated the heparin into millions of syringes and had sold them to customers. *See id.* As here, plaintiff sought damages for, among other things, the cost of recalling and destroying the syringes. *See id.* In contending that the "sudden or dangerous occurrence" exception applied, plaintiff argued that "it suffered damage to 'other property'" because "the contaminated Heparin Sodium USP was merely a component of the" pre-packaged syringes, which it had to destroy. *Id.* at *4. The court rejected this argument, determining that the heparin was part of an "integrated system": the pre-packaged syringe. *See id.* (quoting *Mars, Inc.*, 327 Ill. App. 3d at 355, 763 N.E.2d at 437, 261 Ill. Dec. at 467). Here, as in *Medefil*, Plaintiffs combined a product with other

supplies as intended. Because the product was defective, Plaintiffs suffered damage incidental to the intended use.

Plaintiffs contend that *Medefil* is distinguishable, on the ground that "there was no showing" in *Medefil* "that the heparin syringes posed any danger to health." (Pls.' Opp. 9). "In the absence of any element of danger," Plaintiffs say, "the court held that the alleged damage" to the "integrated system . . . did not constitute damage to other property that was recoverable in tort." (*Id.*) This argument improperly conflates the requirement to allege a dangerous event with the requirement to allege damage extrinsic to the defective product. It is also misleading; the court in *Medefil* said nothing to indicate that its conclusion regarding "other property" had any relation to the alleged health risk (or lack thereof).

In arguing that they have sufficiently alleged damage to "other property," Plaintiffs refer the court to several cases. None is persuasive. In *Mercury Skyline*, a bus driver dumped human waste through a grated bridge onto a tour boat that happened to be passing underneath. 2005 WL 3159680, at *1-2. After determining that the occurrence was sudden and dangerous, the court concluded that it caused "other property" damage: the contamination of plaintiff's boat with human waste. *Id.* at *6. Thus, the court allowed plaintiff to recover cleaning costs in tort. *Id. Mercury Skyline* is nothing like the present case. Namely, there could be no serious argument in *Mercury Skyline* that plaintiff's loss was rooted in "disappointed" consumer expectations.

In *Abco Metals Corp. v. J.W. Imports Co.*, 560 F. Supp. 125, 129-30 (N.D. Ill. 1982), the court determined that plaintiff could recover in tort for the costs of wire destroyed by defendant's defective wire chopper. The court in *Blommer* later relied on *Abco* in concluding that plaintiff could recover in tort for inventory loss (chocolate contaminated with salmonella-infected whey) and contamination of "processing facilities." 635 F. Supp. at 916-17; *see also* 1984 WL 454 at *2. *Abco* and *Blommer*, however, were decided before the Illinois Supreme Court held that a plaintiff cannot recover in tort "for damage to a single product resulting from a sudden and calamitous event," and that courts should apply the "bargained-for" approach in determining what constitutes

a single product. *Trans States Airlines*, 177 Ill. 2d at 42, 50, 682 N.E.2d at 54-55, 58, 224 Ill. Dec. at 493-94, 497 (overruling *Vaughn v. Gen. Motors Corp.*, 102 Ill. 2d 431, 466 N.E.2d 195, 80 Ill. Dec. 743 (1984), the other case that the court in *Blommer* relied upon, to the extent it was inconsistent with the "single product" principle articulated in *Trans States Airlines*). The outcomes in those cases could well be different today. The plaintiff in *Corfab, Inc. v. Modine Mfg. Co.*, 641 F. Supp. 448, 449-50 (N.D. Ill. 1986), in contrast with Plaintiffs here, alleged that it had to compensate its employees for injuries that defendant's product actually caused. Finally, in *Phoenix Chemical Co. v. Piping Engineering Co.*, No. 89 C 20036, 1989 WL 97931, at *4 (N.D. Ill. July 6, 1986), a product malfunctioned and released gases that merely posed a risk of danger to persons or property. The court allowed plaintiff to proceed with its tort claims. *See id*. But as the court has already explained, mere allegations of risk cannot satisfy the "sudden or dangerous occurrence" exception. *See, e.g.*, *Beretta*, 213 Ill. 2d at 416, 821 N.E.2d at 1139, 290 Ill. Dec. at 565; *In re Chicago Flood*, 176 Ill. 2d at 200, 680 N.E.2d at 275, 223 Ill. Dec. at 542.

Foreseeability is a final consideration that supports, but is not necessary to, the court's conclusion that Plaintiffs do not allege "other property" damage. The economic loss doctrine precludes recovery in tort "for any type of damage that one would reasonably expect as a direct consequence of, or incidental to, the failure of the defective product." *Westfield*, 399 Ill. App. 3d at 232, 924 N.E.2d at 1243, 338 Ill. Dec. at 717 (citing *Trans States Airlines*, 177 Ill. 2d at 51, 682 N.E.2d at 58, 224 Ill. Dec. at 497). Some courts have analyzed whether damage is "reasonably expect[ed]" in determining whether plaintiffs have alleged harm to "other property." *See Trans States Airlines*, 177 Ill. 2d at 51, 682 N.E.2d at 58, 224 Ill. Dec. at 497 ("Given the foreseeable consequences that a defective engine would result in damage to the airframe, we believe that parties to the sublease agreement could have bargained in consideration of such risks."); *Westfield*, 399 Ill. App. 3d at 233, 924 N.E.2d at 1244, 338 Ill. Dec. at 718 ("[A] fire extinguisher and some equipment" "are the exact types of property one would expect to be damaged as a direct or incidental consequence of the tractor fire and are, therefore, also barred by the economic

loss doctrine."); *In re StarLink*, 212 F. Supp. 2d at 841 ("The modern trend is to focus on *ex ante* expectations. If the damage is of a type that the buyer could have foreseen resulting from the product failing to perform, it does not constitute harm to other property."); *Medefil*, 2015 WL 3962820, at *4 ("The logical result of any defect in the Heparin Sodium USP . . . would be the failure of the Heparin Lock Syringes a whole. This is the kind of reasonably expected loss that is properly governed by contract law remedies.").

For TreeHouse, the logical and expected result of receiving contaminated sunflower kernels from Defendant, and using them as intended, was that finished products, equipment, and raw materials would also become contaminated. The fact that TreeHouse purchased a product contamination insurance policy from Starr underscores this point. So, too, does TreeHouse's decision to bargain for warranties that the sunflower kernels would be free of contaminants and "safe and fit" for ordinary and intended uses. (*See, e.g.*, First Am. Compl. ¶¶ 15, 66.)

Because Plaintiffs have failed to allege that a "sudden or dangerous occurrence" caused damage to "other property," the court dismisses their claims for negligence and products liability.

**B.** **Negligent Misrepresentation (Count II)**

In Count II of their First Amended Complaint, Plaintiffs assert a claim for negligent misrepresentation. Plaintiffs argue that this claim survives under the third exception to the *Moorman* doctrine, which applies "where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions." *Trans States Airlines*, 177 Ill. 2d at 26, 682 N.E. 2d at 48, 224 Ill. Dec. at 487 (quoting *In re Chicago Flood*, 176 Ill. 2d at 199, 680 N.E.2d at 275, 223 Ill. Dec. at 542). "To state a claim based on the negligent misrepresentation exception to *Moorman*," Plaintiffs "must demonstrate that: (1) defendant is in the business of supplying information for the guidance of others in their business dealings; (2) defendant provided information that constitutes a misrepresentation; and (3) defendant supplied the information for guidance in the plaintiff's business dealings." *Prime Leasing, Inc. v. Kendig*, 332 Ill. App. 3d 300,

311, 773 N.E.2d 84, 94, 265 Ill. Dec. 722, 732 (1st Dist. 2002) (citing *Rankow v. First Chicago Corp.*, 870 F.2d 356, 361 (7th Cir. 1989)).  Courts have "rigidly construed" the requirement that defendant be in the business of supplying information.  *Anderson Elec., Inc. v. Ledbetter Erection Corp.*, 133 Ill. App. 3d 844, 850, 479 N.E.2d 476, 480, 88 Ill. Dec. 863, 867 (4th Dist. 1985).

The "focus" of the negligent misrepresentation exception to the economic loss doctrine "must be on whether the defendant is in the business of supplying *information* as opposed to providing something tangible."  *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 218 Ill. 2d 326, 334, 843 N.E.2d 327, 339, 300 Ill. Dec. 69, 76 (2006); *see Prime Leasing*, 332 Ill. App. 3d at 312, 773 N.E.2d at 95, 265 Ill. Dec. at 733 (courts look to whether the "end product" of the plaintiff-defendant relationship is "a tangible object (i.e., a product) which could be readily described in a contract or whether it is intangible").  The exception "is not applicable if the information supplied is merely ancillary to the sale of a product."  *First Midwest Bank*, 218 Ill. 2d at 335, 843 N.E.2d at 339, 399 Ill. Dec. at 77.

To guide this analysis, courts have described a "continuum" of enterprises falling into three categories.  *Tolan & Son, Inc. v. KLLM Architects, Inc.*, 308 Ill. App. 3d 18, 719 N.E.2d 288, 241 Ill. Dec. 427 (1st Dist. 1999); *see also, e.g.*, *Fox Assocs., Inc. v. Robert Half Int'l, Inc.*, 334 Ill. App. 3d 90, 94-95, 777 N.E.2d 603, 607-08, 267 Ill. Dec. 800, 804-05 (1st Dist. 2002); *Gen. Elec. Capital Corp. v. Equifax Servs., Inc.*, 797 F. Supp. 1432, 1442-43 (N.D. Ill. 1992).  On one extreme are "pure information providers," meaning "businesses that provide a product that consists solely of information."  *Tolan*, 308 Ill. App. 3d at 29, 719 N.E.2d at 297, 241 Ill. Dec. at 436.  "The supplying of information need not encompass the enterprise's entire undertaking but must be central to the business transaction between the parties."  *Id.*  The "end product" on this extreme "is the ideas, not the documents or other objects into which the ideas are incorporated."  *Id.*  On the other extreme are "tangible good providers," meaning "businesses that supply tangible goods and/or noninformational goods or services."  *Id.*  These entities "may exchange information," but "the information relates only to the goods or services and, thus, is supplied incidental to the sale

of the product." *Id.* (internal quotation marks omitted). The "end product" on this extreme "is some sort of tangible object." *Id.* "The final category consists of businesses in between these two extremes: businesses that supply tangible goods (or non-informational goods or services) as well as information." *Id.* Businesses in this "mixed" category "will be deemed to be in the business of supplying information if the information furnished along with the non-informational goods or services is central to the business transactions." *Id.*

Here, Defendant is a supplier of tangible goods: sunflower kernels. Plaintiffs allege that Defendant was also "in the business of supplying health and safety information to its customers." (First Am. Compl. ¶ 18; *see also* Pls.' Opp. 11.) Specifically, they say that Defendant independently analyzed the quality and safety of the sunflower kernels and, based on its analyses, made representations and assurances that were "essential" to transactions with customers. (First Am. Compl. ¶¶ 15, 18, 20; Pls.' Opp. 12.) The representations included, for example, certificates stating that Defendant's sunflower kernels "were free of contaminants." (First Am. Compl. ¶ 15; Pls.' Opp. 12.) Likewise, according to Plaintiffs, Defendant intended for TreeHouse to use the information it supplied "for guidance in" processing the kernels. (First Am. Compl. ¶ 19.) And TreeHouse decided to purchase the kernels in reliance on the information. (*See id.* ¶¶ 25-26; Pls.' Opp. 13 ("[T]he information that SunOpta represented to TreeHouse was vital to TreeHouse's ability to ensure the safety of its own products and avoid liability to the" Food and Drug Administration).) Referencing these allegations, Plaintiffs argue that Defendant is not merely a goods seller that provides information ancillary to sales. Rather, it is a "mixed" enterprise that supplies information "central to [its] business transactions," including those with TreeHouse. *Tolan*, 308 Ill. App. 3d at 29, 719 N.E.2d at 297, 241 Ill. Dec. at 436; *see* Pls.' Opp. 13.

Plaintiffs' argument is not persuasive. Courts have generally found that businesses such as life insurance companies, banks, and financial service providers fall into the "mixed" category on the continuum. *See Tolan*, 308 Ill. App. 3d at 29, 719 N.E.2d at 297, 241 Ill. Dec. at 436; *see also, e.g.*, *Am. Inter-Fidelity Corp. v. M.L. Sullivan Ins. Agency, Inc.*, No. 15 C 4545, 2016 WL

3940092, at * 8 (N.D. Ill. July 21, 2016) ("The types of defendants who have fallen under the exception to the *Moorman* doctrine include, for example, accountants, inspectors, title insurers, real estate brokers, stock brokers, and others whose businesses involve conducting an analysis or investigation before offering information or recommendations to third parties seeking their expertise.").  For these types of businesses, there is often "a fine line between the role of the product and the role of the information supplied . . . ."  *Tolan*, 308 Ill. App. 3d at 29, 719 N.E.2d at 297, 241 Ill. Dec. at 436.  There is no "fine line" in this case.  Even crediting Plaintiffs' allegations that Defendant provided TreeHouse with "independent" analyses concerning sunflower kernels' quality and safety—and that TreeHouse relied on the analyses—"the intended end result" of the relationship between the parties was for Defendant "to create a product, a tangible thing . . . ."  *Tolan*, 308 Ill. App. 3d at 28, 719 N.E.2d at 296, 241 Ill. Dec. at 435 (internal quotation marks omitted).  The information that Defendant provided was related to the tangible product and "merely ancillary" to the sale.  *First Midwest Bank*, 218 Ill. 2d at 335, 843 N.E.2d at 339, 300 Ill. Dec. at 77.  Put another way, nothing in Plaintiffs' complaint suggests that Defendant was in the business of supplying information except in connection with selling sunflower kernels.

Ample case law supports this conclusion.  Indeed, "[c]ourts have consistently held that manufacturers of tangible noninformational goods—such as chemical compounds, roofing materials, or computer systems—are not in the business of supplying information."  *Orix Credit Alliance v. Taylor Mach. Works, Inc.*, 125 F.3d 468, 476 (7th Cir. 1997); *see also Tolan*, 308 Ill. App. 3d at 29, 719 N.E.2d at 297, 241 Ill. Dec. at 436 (Although a supplier of tangible goods "may exchange information, the information relates only to the goods or services, and, thus, is supplied incidental to the sale of the product" (internal quotation marks omitted)); *Budnick Converting, Inc. v. Nebula Glass Int'l, Inc.*, 866 F. Supp. 2d 976, 996 (S.D. Ill. 2012) ("Simply because" insulated glass manufacturer "provided information about one of its products, does not transform [it] into the business of supplying information for the guidance of others in their business dealings"); *Gen. Elec.*, 797 F. Supp. at 1442 ("[E]ven when" suppliers of non-informational goods or services

"supply information during a business transaction, they do not meet the 'in the business of supplying information' requirement"); *cf. Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*, 176 Ill. 2d 160, 169, 679 N.E.2d 1197, 1202, 223 Ill. Dec. 424, 429 (1997) (engineering firm's "plans and drawings were incidental to a tangible product, *i.e.*, the water supply system").  Plaintiffs' cited cases are not to the contrary because they do not concern businesses that manufacture and supply tangible goods.  (*See* Pls.' Opp. 11-13 & n.12.)[5]  Finally, as Defendant points out, Plaintiffs do not allege a fiduciary or other special relationship between TreeHouse and Defendant that would subject Defendant to a duty of care in supplying information.  *See Catalan*, 629 F.3d at 693 (stating that the exceptions to the *Moorman* doctrine "have in common the existence of an extra-contractual duty between the parties").

## C.    Contribution and Indemnity (Count VII)

In Count VII of their First Amended Complaint, Plaintiffs assert a claim for contribution under the Illinois Joint Tortfeasor Contribution Act, 740 Ill. Comp. Stat. § 100/1 *et seq.* (the "Contribution Act"), or, alternatively, for "implied indemnity based on principles of quasi-contract." (Pls.' Opp. 14-15; First Am. Compl. ¶¶ 82-86.)  Plaintiffs seek to recover the "payments, credits, discounts, and other valuable consideration" that TreeHouse "extended to" its customers due to Defendant's "negligence, negligent misrepresentations, supply of defective products, and breaches of express and implied warranties."  (First Am. Compl. ¶ 84.)  Because TreeHouse made a claim to Starr for these damages, Plaintiffs allege, Defendant is liable to both TreeHouse and Starr.  (*Id.* ¶¶ 83-84.)

The Contribution Act provides that "where 2 or more persons are subject to liability in tort arising out of the same injury to person or property, there is a right of contribution among

---

[5]     *Duchossois Indus., Inc. v. Stelloh*, No. 87 C 4132, 1988 WL 2794 (N.D. Ill. Jan. 13, 1988) is unique.  (*See* Pls.' Opp. 12 n.3.)  There, an art seller prepared a provenance that verified the authenticity of a painting he sold.  1988 WL 2794, at *1.  He gave the provenance to the buyer with "full knowledge" that the buyer would use it when he resold the painting.  *Id.* at *6.  The provenance was critical to the transaction because it supplied the painting's value and guided the buyers in his business transactions.  *See id.*

them . . . ."  740 Ill. Comp. Stat. § 100/2(a); *see also, e.g.*, *Muirfield*, 349 Ill. App. 3d at 188,810 N.E.2d at 245, 284 Ill. Dec. at 592 ("In order to properly state a claim for contribution, the plaintiff in contribution must allege that it and the defendant in contribution are both subject to liability in tort to the injured party, and that the liability of the plaintiff and the defendant in contribution arises out of the same injury.").  The court dismisses Plaintiffs' claim for contribution because Plaintiffs have not alleged an underlying tort.  For reasons already discussed, Plaintiffs cannot proceed against Defendant in tort to recover damages relating to the recall.  And in their First Amended Complaint, Plaintiffs do not plead any facts indicating that TreeHouse and Defendant are jointly liable in tort to TreeHouse's customers based on recall-related events.  Rather, the payments TreeHouse made to its customers are the type that would typically be required under a contractual arrangement.  Nothing in the First Amended Complaint suggests otherwise.

Plaintiffs' indemnity claim fares no better.  "To state a cause of action for implied indemnity based upon quasi-contractual principles, a third-party complaint must allege (1) a pre-tort relationship between the third-party plaintiff and the third-party defendant, and (2) a qualitative distinction between the conduct of the third-party plaintiff and the third-party defendant." *Kerschner v. Weiss & Co.*, 282 Ill. App. 3d 497, 503, 667 N.E.2d 1351, 1356, 217 Ill. Dec. 775, 780 (1st Dist. 1996).  Plaintiffs argue that "TreeHouse has alleged a pre-tort relationship with SunOpta, namely, that of buyer and seller." (Pls.' Opp. 15.)  But the "classic pre-tort relationships which give rise to a duty to indemnify are between lessor and lessee, employer and employee, owner and lessee, and master and servant." *AMF, Inc. v. Victor J. Andrew High Sch.*, 172 Ill. App. 3d 337, 342, 526 N.E.2d 584, 587, 122 Ill. Dec. 325, 328 (1st Dist. 1988).  A "purchaser-customer" relationship does not suffice.  *See id.*; *see also, e.g.*, *Canadian Pac. Ry. Co. v. Williams-Hayward Protective Coatings, Inc.*, No. 02 C 8800, 2004 WL 2108413, at *5 (N.D. Ill. Sept. 21, 2004) (same).  Furthermore, Plaintiffs assert a claim for contractual indemnity based on the actual contract between TreeHouse and Defendant.  (*See* First Am. Compl. ¶¶ 65-69 (Count IV).)  "The general rule is that no quasi-contractual claim can arise when a contract exists between

the parties concerning the same subject matter on which the quasi-contractual claim rests." *Indus. Lift Truck Serv. Corp. v. Mitsubishi Int'l Corp.*, 104 Ill. App. 3d 357, 360, 432 N.E.2d 999, 1002, 60 Ill. Dec. 100, 103 (1st Dist. 1982); *see also Cmty. Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803, 819 ("Illinois . . . do[es] not recognize implied contracts where written agreements define the business relationship.").  The court dismisses Plaintiffs' implied indemnity claim for both reasons.

## <u>CONCLUSION</u>

For the foregoing reasons, the court grants Defendant's Partial Motion to Dismiss Counts I, II, III, and VII of Plaintiff's Amended Complaint [21, 40].

ENTER:

Dated:  March 29, 2019

_____
REBECCA R. PALLMEYER
United States District Judge