## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

TREEHOUSE FOODS, INC., BAY
VALLEY FOODS, LLC, FLAGSTONE
FOODS, INC., TREEHOUSE
PRIVATE BRANDS, INC., and
LLOYD'S SYNDICATE CVS 1919, as
subrogee of Treehouse Foods, Inc,

Plaintiffs,

v.

SUNOPTA GRAINS AND FOODS
INC.,

Defendant.

Case No. 18-cv-1412

Judge Mary M. Rowland

## <u>MEMORANDUM OPINION AND ORDER</u>

This case involves a recall of sunflower kernels. SunOpta sold sunflower kernels to food manufacturer TreeHouse, and TreeHouse brought this lawsuit claiming more than $16 million dollars in damages resulting from SunOpta's recall in 2016. TreeHouse has four remaining claims in this case based on breach of contract and breach of warranty. SunOpta also brought three counterclaims seeking a declaration that Treehouse's remedies are limited to the product purchase price and for breach of contract or unjust enrichment, alleging that Treehouse owes SunOpta $893,416.

For the reasons stated below, SunOpta's motion for summary judgment [93] is granted in part and denied in part and Plaintiffs' partial motion for summary judgment [105] is denied.

1

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id*. After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 250 (internal quotations omitted).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (internal citation and quotations omitted). In doing so, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id*. (citation omitted).

When cross-motions for summary judgment are filed, the Court construes all facts and draws all reasonable inferences in favor of the party against whom the motion

2

was filed. *Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 361 (7th Cir. 2017). The Court treats the motions "separately in determining whether judgment should be entered in accordance with Rule 56." *Marcatante v. City of Chi.*, 657 F.3d 433, 439 (7th Cir. 2011). *See also Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 416 (7th Cir. 2019) ("Each cross movant for summary judgment bears a respective burden to show no issue of material fact with respect to the claim.").

## BACKGROUND[1]

### I.      Parties and Procedural History

Plaintiffs are TreeHouse Foods, Inc., and its affiliated entities ("TreeHouse"), and its insurer, Lloyd's Syndicate 1919 (collectively "Plaintiffs"). (PSOF ¶¶ 1-5). TreeHouse manufactures and sells an extensive line of ready-to-eat foods, including private-label sunflower products and various granolas that incorporate sunflower kernels obtained from SunOpta. (PSOF ¶ 8). Defendant SunOpta Grains and Foods Inc. ("SunOpta") is a Minnesota company based in Edina, Minnesota;[2] it is a

---

[1] The facts in this Background section are undisputed unless otherwise noted. Plaintiffs' Rule 56.1 Statement of Facts (Dkt. 107) is abbreviated as "PSOF". SunOpta's Rule 56.1 Statement of Facts (Dkt. 96) is abbreviated as "DSOF". SunOpta responded to Plaintiffs' Statement of Facts and provided a Statement of Additional Facts. (Dkt. 119.) Plaintiffs responded to SunOpta's Statement of Facts. (Dkt. 126.) Because the parties did not file reply briefs pursuant to this Court's order (*see* Dkts. 117, 129), the Court does not consider SunOpta's Statement of Additional Facts to be admitted by Plaintiffs.

[2] Although the Court applied Illinois law in the ruling on the motion to dismiss, SunOpta asks the Court to apply Minnesota law. (Dkt. 98 at 9-10). Plaintiffs "do not concede that Minnesota law governs" but are unaware of any substantive conflict between Illinois and Minnesota law requiring a choice-of-law analysis and cite authority from both jurisdictions. (Dkt. 128 at 7). Because Plaintiffs do not affirmatively object to SunOpta's argument to apply Minnesota law and because neither party has briefed choice of law, the Court applies Minnesota law.

manufacturer and seller of many raw materials and food products, including sunflower kernels. (DSOF ¶ 1).

Since at least 2011, SunOpta sold sunflower kernels to ConAgra and Flagstone, which at the time were unrelated companies unaffiliated with TreeHouse. (DSOF ¶ 8).[3] In the food industry, parties usually operate based on "forward contracts", which use a set price for buying a product over a period of time (in contrast to "spot buys" which are for smaller, individual orders typically at higher prices). (DSOF ¶¶ 9, 11).

The operative complaint is the Second Amended Complaint (Dkt. 65) (hereafter, "Complaint"). On March 29, 2019, the Court granted SunOpta's motion to dismiss Plaintiffs' Counts I, II, III, and VII, leaving only Plaintiffs' breach of contract and breach of warranty claims in the case. (Dkt. 87).

## II. The Recall

On May 2, 2016, SunOpta issued an "URGENT: FOOD RECALL" notice informing TreeHouse that SunOpta was recalling roasted sunflower kernel products produced at its Crookston, Minnesota, plant between February 1 and February 19, 2016, "due to the potential presence of Listeria monocytogenes ("*LM*")." (PSOF ¶ 9). On May 18,

---

[3] "TreeHouse" refers to TreeHouse Foods, Inc., and its affiliated entities. Bay Valley Foods, Inc. is an operating company for, and wholly-owned subsidiary of, TreeHouse Foods, Inc. (DSOF ¶2). Bay Valley acquired Flagstone Foods, Inc. in June 2014. Flagstone is now a wholly owned subsidiary of Bay Valley. (*Id*. ¶3). Flagstone acquired American Importing Company in 2009. (*Id*.) On February 1, 2016, Bay Valley acquired Ralcorp Holdings, Inc. from ConAgra Foods ("ConAgra"), which was ConAgra's private brands division, and changed its name to TreeHouse Private Brands, Inc. ("Private Brands"). (*Id*. ¶4). It also appears undisputed that Snack Holdings later became Flagstone. (Dkt. 126 at 6). For ease of reference in this opinion, the Court generally refers to TreeHouse and any affiliated entity as "TreeHouse."

2016, following additional positive Listeria results from a second customer, as well as positive results from SunOpta's testing of retained samples of kernels, SunOpta expanded its recall. (PSOF ¶ 12). Further testing by SunOpta showed that kernels produced in October 2015 were positive for Listeria, and so SunOpta expanded the recall a third time to encompass the full shelf-life of sunflower kernels. (PSOF ¶ 13).[4] The recall ultimately involved kernels produced between May 31, 2015 and April 21, 2016, some of which it had sold and shipped to TreeHouse facilities in Minneapolis and Lakeville, Minnesota. (DSOF ¶ 5).

SunOpta instructed TreeHouse to "either destroy the affected product or return the recalled product." (PSOF ¶ 15). In SunOpta's report to the U.S. Food and Drug Administration (FDA) on the reason for the recall, SunOpta identified positive tests from its Crookston facility between September 2015 and January 2016, in addition to the original confirmations of Listeria from production during the weeks of February 1 and February 8, 2016. (PSOF ¶ 18). The FDA classified SunOpta's recall as a Class 1 Recall. (PSOF ¶ 24). TreeHouse then conducted its own recall of products affected by SunOpta's recall. (PSOF ¶ 20).

### III.   The Contracting Documents

The parties dispute which documents were part of their contractual agreement: (1) the Sales Contracts; (2) the Guarantees; or (3) the Purchase Orders. (As explained below, the parties do not dispute that the SunOpta Specifications were part of their agreement).

---

[4] Listeria is a genus with 17 different species, one of which is *LM*. (DSOF ¶ 75).

### A. The Sales Contracts

SunOpta argues that five sales contracts ("Sales Contracts") are the only enforceable contracts. These contracts are form contracts drafted by SunOpta that contain identical relevant Terms and Conditions:

> "This contract constitutes the full understanding of the parties and is a complete and exclusive statement of the terms of their agreement. No items, conditions, understanding, agreement, assignment, purchase order, confirmation or acknowledgment purporting to modify or vary the terms of this contract shall be binding upon the parties unless the same shall be made in writing and signed by an authorized signatory of both parties."

> "The SUNOPTA GRAINS AND FOOD GROUP liability, whether contractual or otherwise, is exclusively limited to the purchase price of the product under all circumstances and regardless of the nature, cause or extent of the loss."

Sales Contract 5638 states that its effective date is June 19, 2014; it is signed by TreeHouse on September 2, 2014. (Dkt. 101, Exh. 55). Sales Contract 5639, with an effective date of June 19, 2014 is signed by TreeHouse on September 2, 2014. (Dkt. 101, Exh. 55). Sales Contract 5745 states that its effective date is August 7, 2014. (Dkt. 101, Exh. 104). Sales Contracts 6263 and 6264 have an effective date of October 20, 2015. (Dkt. 101, Exh. 71). Sales Contracts 5745, 6263, and 6264 are not signed by either party. In all the Sales Contracts, the Terms and Conditions appear after the signature block.

All of the Sales Contracts refer to "product specifications." SunOpta provides its customers with specifications for its sunflower kernel products, which specifications the parties agree were part of their agreement (hereafter, "SunOpta Specifications"). (DSOF ¶13).

6

### B. The Guarantees

SunOpta provides "pure food guarantees" to its customers, executing approximately 250 guarantees per year. (Dkt. 119 at 11; PSOF ¶50). The 2014 Guarantee, drafted by TreeHouse, is dated March 20, 2014, and provides, in pertinent part:

> "Supplier [] hereby represents, warrants, guarantees, that any article shipped to [Buyer] has been produced in accordance with good manufacturing practices and, as of the date of such shipment or delivery (a) is not altered or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act, as amended and any regulations adopted thereunder (hereafter FD&C ACT) or within the meaning of any other applicable federal, state or municipal law; (b) is not an article which may not under the FD&C Act or any other applicable law be introduced into interstate or intrastate commerce; and (c) is merchantable and fit for its intended purpose."

> "Supplier further agrees to indemnify, hold harmless, and if requested by Buyer to defend Buyer, from and against any and all claims, demands, lawsuits, actions, proceedings, liabilities, fines, penalties, losses and expenses (including, but not limited to, reasonable attorney fees and costs) brought against or incurred by the Buyer arising out of or pertaining to any breach or alleged breach by Supplier of paragraph 1."

(Dkt. 109-2; Exh. 166). Although only signed by a SunOpta representative, the 2014 Guarantee states it "shall become effective when it has been signed by both parties." The 2015 Guarantee,[5] dated May 8, 2015 and signed by Marc Sorensen, SunOpta Plant Manager, contains similar warranty and indemnification language. (Dkt. 109-3; Exh. 185). The 2016 Guarantee is dated January 22, 2016 and signed by Ron Klinge, SunOpta Quality Assurance Director. (Dkt. 109-2; Exh. 160). (There is only one signature block on the 2015 and 2016 Guarantees). The 2016 Guarantee

---

[5] *See* Dkt. 106 at 13 (noting the Guarantees were on Treehouse's form).

7

contains the same warranty and indemnification provisions as the 2015 Guarantee. Klinge discussed the 2016 Guarantee with his superior, Lisa Robinson, Vice President of Food Safety and Regulatory Compliance ("Robinson"). (PSOF ¶ 47). When Klinge returned the 2016 Guarantee he also signed and returned the Receipt and Acknowledgement to comply with TreeHouse's Supplier Manual. (PSOF ¶ 49).

### C. Purchase Orders

The 2015 Purchase Order is a TreeHouse form that states that it is "to SunOpta" and references Sales Contract 6263. (Dkt. 101, Exh. 63). It has one signature, by Tim Larson of TreeHouse, signed on November 3, 2015. (*Id.*; see also Dkt. 126 at 15). On the first page, it states that "this Purchase Order is subject to the terms & conditions appearing below." The terms and conditions on the second page contain a warranty provision and indemnity provision. The Purchase Order also states that it is the "controlling document…unless another written contract between Buyer and Seller provides otherwise." Purchase orders were also issued referencing Sales Contracts 5638, 5639 and 6264. (DSOF ¶25; Dkt. 126 at 15).

## ANALYSIS

## I. SunOpta's Summary Judgment Motion

SunOpta moves for judgment on Counts IV, V, and VIII of Plaintiffs' Complaint and on Counts I, II, and III of its Amended Counterclaim. (Dkt. 93). SunOpta also moves for partial summary judgment on Plaintiffs' implied warranty of merchantability claim (Count VI). (Dkt. 98 at 25). Before discussing each claim, the

Court addresses the parties' dispute over what their contractual agreement was in this case.

### A. The Parties' Agreement

The parties dispute what constituted their contractual agreement. The Court finds that the parties are bound by the Sales Contracts (with one exception) and the SunOpta Specifications. Plaintiffs argue that the Sales Contracts are not enforceable because: (1) the TreeHouse Purchase Orders are the operative contracts; (2) some of the Sales Contracts are unsigned; and (3) the placement of the signature line before the Sales Contracts' Terms and Conditions renders those Terms and Conditions unenforceable.

### 1. The Sales Contracts, not the Purchase Orders, Control

There are five Sales Contracts: 5638, 5639, 6263, 6264, and 5745. These contracts described the quantity and price of sunflower kernels to be sold to TreeHouse, attached Terms and Conditions, and referenced the SunOpta Specifications. The parties agree that the SunOpta Specifications, which describe the characteristics and quality of kernels being sold to TreeHouse, were part of their agreement.

Plaintiffs maintain that the Sales Contracts only confirmed the "economic terms" of the parties' agreement. Plaintiffs rely on their Purchase Orders and attached terms and conditions as the controlling documents to allege that SunOpta made express warranties about the kernels that SunOpta breached by selling and supplying defective products and that SunOpta failed to indemnify Treehouse. (Complaint, pp. 10-11). SunOpta responds that the Sales Contracts are fully integrated contracts that

9

bar the warranty and indemnity provisions in the Purchase Orders. The Court agrees with SunOpta.

The Sales Contracts meet the basic requirements of an enforceable contract for the sale of goods under the UCC: they are in writing, contain information about the quantity of goods to be sold, and meet the statute of frauds requirement (with one exception). *See* Minn. Stat. § 336.2-201. In addition, they are unambiguous and represent the completely integrated and exclusive statement of the terms of the parties' agreement. *See Alpha Real Estate Co. v. Delta Dental Plan*, 664 N.W.2d 303, 314 (Minn. 2003); *see also* Minn. Stat. § 336.2-202. Each Sales Contract contains the integration clause stating that it is the "full understanding of the parties and is a complete and exclusive statement of the terms of their agreement." *See Alpha Real Estate Co.*, 664 N.W.2d at 312 ("A merger clause establishes that the parties intended the writing to be an integration of their agreement."). The Sales Contracts also expressly bar modification by any agreement or *purchase order* that is not signed by both parties. Each Purchase Order (signed only by Treehouse) states that it is the "controlling document…*unless another written contract between Buyer and Seller provides otherwise*." DSOF ¶31 (emphasis added); Dkt. 126 ¶31 (admitting the Purchase Orders contain this language).

To argue that the Sales Contracts were confirmations only of the "economic terms" of the parties' agreement, Plaintiffs cite for example to the deposition testimony of Ron Loude, who negotiated many of the contracts on behalf of TreeHouse. (Dkt. 126 at 7, 17; Dkt. 128 at 9). But given the unambiguous language in the Sales Contracts,

particularly the integration clause and provision barring reliance on any purchase order not signed by both parties, as well as the unambiguous language in the Purchase Order that it is not the controlling document if another written contract provides otherwise, the Court need not look to extrinsic evidence to determine the meaning of the parties' agreement.

Therefore, the Sales Contracts, including their Terms and Conditions, control.

### 2. Unsigned Sales Contracts

Two of the five Sales Contracts, numbers 5638 and 5639, are signed by TreeHouse, satisfying the UCC's statute of frauds. Minn. Stat. § 336.2-201. Plaintiffs do not deny that TreeHouse received Sales Contracts 6263 and 6264 or that they operated under the "economic terms" of those contracts. Plaintiffs argue, however, that because Sales Contracts 6263, 6264, and 5745 are unsigned, they are unenforceable. (Dkt. 128 at 9-10). Plaintiffs admit that they "issued master purchase orders for the products described" in those Sales Contracts. (*Id*. at 9).

One Purchase Order expressly references Sales Contract 6263 and is signed by Tim Larson of TreeHouse. (Dkt. 101, Exh. 63; Dkt. 126 ¶30). Another Purchase Order issued by TreeHouse references Sales Contract 6264 and is also signed by Larson. (*Id*.) These signatures are effective to bind TreeHouse to Sales Contracts 6263 and 6264. *See* Minn. Stat. § 336.2-201(1); *Simplex Supplies, Inc. v. Abhe & Svoboda, Inc.,* 586 N.W.2d 797, 801-02 (Minn. Ct. App. 1998).[6]

---

[6] TreeHouse stresses that it "rejected" Sales Contract 6263 and 6263 (Dkts. 128 at 9-10; 126 at 17-18). Loude testified that he was told not to sign (by a superior) "and to confirm in a different manner." (Loude Dep. p.125). However, as SunOpta argues, the Sales Contracts

As to Sales Contract 5745, however, Plaintiffs argue that because ConAgra did not sign the 2014 Sales Contract 5745, the ConAgra Purchase Order Terms and Conditions control. (Dkt. 128 at 10; Ex. 32 to Fisher Aff.). SunOpta does not address how Sales Contract 5745 satisfies the UCC statute of frauds other than to argue that this was the parties "course of dealing" (Dkt. 98 at 16) but that does not satisfy the statute of frauds. Minn. Stat. § 336.2-201; *see Drywall Supply Cent., Inc. v. Trex Co.*, 2007 U.S. Dist. LEXIS 83050, at \*7 (D. Minn. Nov. 8, 2007). Similarly, Plaintiffs have not explained how the ConAgra Purchase Order satisfies the UCC statute of frauds. For example they have not provided evidence that SunOpta received the ConAgra Purchase Order Terms and Conditions or had "reason to know its contents." Minn. Stat. § 336.2-201(2). Plaintiffs argue only that the SunOpta Bates number "evidenc[es] that SunOpta received it." (Dkt. 126 at 21). Plaintiffs do not cite any authority that a party's producing a document in litigation satisfies the statute of frauds.

Therefore, neither party can satisfy the statute of frauds as to Sales Contract 5745 or the ConAgra Purchase Order. To the extent Plaintiffs seek to recover based on the ConAgra Purchase Order, that claim is barred.

---

contain a statement above the signature line that "failure to return signed copy indicates acceptance as written." And Larson signed the Purchase Orders referencing these Sales Contracts. Plaintiffs' reliance on deposition testimony is not convincing where extrinsic evidence would not be needed to interpret the parties' agreement. *See Leonard v. Exec. Risk. Indem., Inc. (In re SRC Holding Corp.)*, 545 F.3d 661, 667-68 (8th Cir. 2008) (extrinsic evidence not considered if relevant contract language is unambiguous).

### 3. The Placement of the Terms and Conditions

It is undisputed that the signature blocks on the Sales Contracts were not at the end of the contract. Plaintiffs argue that the placement of the Terms and Conditions after the signature lines make them unenforceable. Plaintiffs rely on non-UCC cases[7] in Minnesota that find: "[w]hen terms appear below the signature, or on the back of the instrument, a signature authenticates only the matter intended by the parties to be included as part of the instrument. This intent must be manifested either by express reference or by internal evidence in the writings involved from which an inference of such intention follows." *Huebsch Laundry Co. v. Deluxe Diecutting*, 2001 Minn. App. LEXIS 183, at *3 (Ct. App. Feb. 20, 2001) (service agreement) (*quoting Brown v. State Auto Ins. Ass'n*, 216 Minn. 329, 337, 12 N.W.2d 712, 716 (1944)) (automobile liability insurance policy). *Cf. Sitterley v. Gray*, 199 Minn. 475 (1937) (advertisement agreement).

This argument is easily dispensed. The UCC statute of frauds permits the signature of the party to be charged to be on a "separate writing." Minn. Stat. § 336.2-201(1) (requiring "some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by the party's authorized agent or broker"); *Quinn-Shepherdson Co. v. Triumph Farmers Elevator Co.,* 149 Minn. 24, 25, 182 N.W. 710, 711 (1921). "For

---

[7] The cases Plaintiffs cite involving the UCC address whether provisions in a contract were conspicuous enough to disclaim warranties under the UCC. *Agristor Leasing v. Guggisberg*, 617 F. Supp. 902 (1985); *Anderson v. Farmers Hybrid Companies, Inc.*, 408 N.E. 2d 1194 (Ill. App. Ct. 1980). Those cases do not stand for the proposition that terms in contract for the sale of goods are unenforceable solely because they appear after the signature line.

writings to be effective against a party, the statute of frauds on the sale of goods requires that at least one writing contain the signature of the party to be charged. The signature can be found on any document and may consist of 'any symbol executed or adopted by a party with present intention to authenticate a writing.'" *Simplex Supplies, Inc.*, 586 N.W.2d at 801 (citations omitted). As discussed, Sales Contracts 5638, 5639, 6263 and 6264 all meet the requirements of the statute of frauds, so the location of the Terms and Conditions in those contracts in relation to TreeHouse's signature does not impact the enforceability of the Terms and Conditions.

### B. Breach of Contract/Breach of Express Warranty/Indemnity (Count IV)

In Count IV, Plaintiffs allege breach of contract, breach of express warranty, and breach of an agreement to indemnify. The Court has determined that the Sales Contracts, not the Purchase Orders, represent the parties' agreement in this case. Therefore, Plaintiffs failed to create any genuine issue of fact that SunOpta breached the terms of the Purchase Orders, including the indemnity provision. Plaintiffs' claim for breach of contract and breach of indemnity fails. Accordingly, SunOpta's summary judgment motion on Count IV is granted in part.

However, the parties agree, and the evidence demonstrates, that the SunOpta Specifications were part of their agreement.[8] Those specifications were incorporated into the Sales Contracts and contain express warranties.

---

[8] SunOpta states that the "Sales Contracts incorporate product specifications by reference" (Dkt. 121 at 16), and Plaintiffs agree that the SunOpta Specifications were part of their agreements. (Dkt. 126 at 5).

"An express warranty arises from any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." *Valley Paving, Inc. v. Dexter & Chaney, Inc.*, 2000 Minn. App. LEXIS 897, at *6 (Ct. App. Aug. 22, 2000); Minn. Stat. § 336.2-313. As SunOpta acknowledges, "the U.C.C. encourages negotiated agreements in commercial transactions, including warranties and limitations." *Transp. Corp. of Am. v. IBM Corp.*, 30 F.3d 953, 959-60 (8th Cir. 1994). (Dkt. 121 at 14). "To establish a breach of warranty claim, a plaintiff must prove: 'the existence of a warranty, a breach, and a causal link between the breach and the alleged harm.'" *Bollom v. Brunswick Corp.*, 2020 U.S. Dist. LEXIS 63669, at *20 (D. Minn. Apr. 10, 2020) (quoting *Peterson v. Bendix Home Sys., Inc.*, 318 N.W.2d 50, 52-53 (Minn. 1982)).

The SunOpta Specifications expressly warrant that the goods will conform with the FDCA as well as Good Manufacturing Practice 21 CFR Part 110. Nevertheless, SunOpta relies on the statement at the bottom of the specifications that "no warranty…is implied or inferred." SunOpta noticeably does not quote the entirety of that statement which provides that "no warranty, guarantee, or freedom *from patent infringement* is implied or inferred." (emphasis added). That statement is about patent infringement, not food quality.

The Court in *Dakota Style Foods, Inc. v. SunOpta Grains & Foods, Inc.*, which involved the same 2016 recall in a suit by a different plaintiff against SunOpta, similarly found that the product specifications were part of the parties' contracts and those "specifications serve as an express warranty" related to the quality of the

kernels. 329 F. Supp. 3d 794, 802 (D.S.D. 2018). Moreover, under the UCC, "[w]ords or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other" Minn. Stat. § 336.2-316(1). The SunOpta Specifications cannot be reasonably read to create an express warranty and then in the same document, negate or limit that exact warranty.

Finding genuine issues of material fact about whether SunOpta breached express warranties made to TreeHouse, SunOpta's motion for summary judgment on Count IV based on breach of express warranties contained in the Specifications is denied.

### C. Breach of Implied Warranties (Counts V and VI)

SunOpta moves for summary judgment on Plaintiffs' claims for breach of implied warranty of fitness (Count V) and breach of implied warranty of merchantability (Count VI).

#### 1. Implied Warranty of Fitness

An implied warranty of fitness for a particular purpose exists "when a plaintiff shows that: (1) the seller had reason to know of the buyer's particular purpose; (2) the seller had reason to know that the buyer was relying on the seller's skill or judgment to furnish appropriate goods; and (3) the buyer actually relied." *Twin City Die Castings Co. v. Yamazen, Inc.*, 2005 U.S. Dist. LEXIS 13455, *14-15 (D. Minn. July 6, 2005) (citation and quotations omitted). SunOpta first contends that TreeHouse had no particular purpose for the kernels because "[p]urchasing a food product or ingredient for the purpose of furnishing that product for human consumption is an

ordinary purpose, not a particular one." (Dkt. 98 at 24). In its statement of facts, SunOpta states that its sunflower kernels produced at the Crookston plant can be raw or roasted, roasted with salt or without salt, and come in various sizes. (DSOF ¶7). The SunOpta Specifications provided to TreeHouse are for "Oil Roasted & Salted Sunflower Kernels" and contain information about features and benefits, general requirements, packaging and shelf life, analysis of components such as salt and moisture, and specific characteristics of color, texture, flavor, and odor. The Court in *Dakota Style Foods, Inc.*, 329 F. Supp. 3d 794 concluded that SunOpta's providing sunflower kernels to plaintiff according to SunOpta's product specifications and flavoring according to plaintiff's request showed that SunOpta furnished the product for plaintiff's particular purpose. This Court finds this reasoning persuasive. In light of the record including the SunOpta Specifications, Plaintiffs have raised a genuine issue of fact whether TreeHouse's purchase of the sunflower kernels was for a particular purpose.[9]

SunOpta next argues that there is no evidence it knew Plaintiffs were relying on SunOpta's skill or judgment to select the sunflower kernels. In *Willmar Cookie Co. v. Pippin Pecan Co.*, 357 N.W.2d 111, 115 (Minn. Ct. App. 1984), the court held the jury

---

[9] The two cases relied on by SunOpta involving food products do not apply Minnesota law, are not binding on this Court, and are distinguishable. In *Gedalia v. Whole Foods Mkt. Servs., Inc.*, 53 F. Supp. 3d 943 (S.D. Tex. 2014), plaintiffs did *not* allege the food products were contaminated, and the court noted that under Texas law, a retailer who sells unwholesome food for human consumption is liable to the consumer for the consequences under an implied warranty as a matter of public policy. *In re McDonald's French Fries Litig.*, 503 F. Supp. 2d 953 (N.D. Ill. 2007) involved a class of consumers bringing suit against a fast food chain, and the court found plaintiffs failed to allege in their complaint what non-ordinary use a consumer would have for french fries.

could have inferred plaintiff's reliance on defendant's skill or judgment to furnish appropriate goods from the fact that plaintiff had previously received, approved, and processed a shipment of pecans from defendant, and could have inferred that plaintiff relied on receiving pecans of reasonably similar quality to those in the sample and previous shipment. Similarly here, the parties' longstanding relationship as evidenced in the record as well as the SunOpta Specifications themselves raise a genuine issue of fact about whether TreeHouse relied on SunOpta's skill in providing a particular quality of goods.

### 2. Implied Warranty of Merchantability

SunOpta seeks partial summary judgment on Plaintiffs' claim of breach of implied warranty of merchantability. (Dkt. 98 at 25). "An implied warranty of merchantability provides that the product is fit for its ordinary and intended use. An implied warranty of merchantability arises automatically when the product is a 'good' and the seller is in the business of furnishing the product to the consumer." *Twin City Die Castings*, 2005 U.S. Dist. LEXIS 13455, at *13 (citing Minn. Stat. § 336.2-314). SunOpta argues that this claim fails as a matter of law "as to all but a tiny fraction of the products sold to TreeHouse" because Plaintiffs lack evidence of a defect in a majority of the products. (Dkt. 98 at 25-27). SunOpta maintains that Plaintiffs have the burden to prove that TreeHouse actually received products containing *LM*, and only those products, which SunOpta says amounts to only 2.5% of the kernels sold to TreeHouse, can support Plaintiffs' claims. (*Id*. at 27).

18

The Court in *Dakota Style Foods* rejected the same argument by SunOpta, that plaintiff had not provided evidence of defect in the product, because "the evidence of the recall itself and increased risk of contamination demonstrate that the product SunOpta provided to Dakota Style was defective." 329 F. Supp. 3d at 809. Indeed under Minnesota law, circumstantial evidence can be used to prove a defective condition. *Bollom*, 2020 U.S. Dist. LEXIS 63669, at *20; *Int'l Fin. Servs. v. Franz*, 534 N.W.2d 261, 266 (Minn. 1995). Moreover, the Court is not convinced by SunOpta's reliance on *Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd*., 789 F. Supp. 2d 1148 (D. Minn. 2011). In that case, there was no evidence whatsoever that the recalled meat at issue was contaminated in any way. *Id*. at 1155. Here, SunOpta admits 134,160 pounds of kernel was contaminated. Giving Plaintiffs the benefit of reasonable inferences from the evidence, the Class 1 Recall itself, combined with SunOpta's admission that some kernel sold to TreeHouse was contaminated, is evidence sufficient to defeat summary judgment on this claim. Whether SunOpta breached the implied warranty of merchantability is a question for the jury.

## II. Breach of Continuing Product Guarantees (Count VIII)

The parties have cross-moved for summary judgment on Count VIII. Given the substantial overlap in the arguments and relevant facts, the Court addresses both motions, keeping in mind the obligation of each party to meet its burden in moving for summary judgment.

Plaintiffs argue that SunOpta breached the 2014, 2015, and 2016 Guarantees it issued to TreeHouse.[10] To prevail on a breach of contract claim, a plaintiff must prove that defendant breached a material term of the contract, and that this breach proximately caused plaintiff's damages. *LeMond Cycling, Inc. v. PTI Holding, Inc.*, 2005 U.S. Dist. LEXIS 742, at *10 (D. Minn. Jan. 14, 2005). The two terms that Plaintiffs contend SunOpta breached in the Guarantees are the (1) indemnity provision and the (2) express warranty. SunOpta raises several challenges to the enforceability of these Guarantees.

The Court agrees with SunOpta that the integration clauses in the Sales Contracts bars Plaintiffs' reliance on the Guarantees. Given the Court's finding that the Sales Contracts are completely integrated agreements, and given the clear integration provision and requirement that any modification be in writing and signed by both parties, Plaintiffs are barred from relying on the indemnification provision in the Guarantees. *See supra* Section I.A. Plaintiffs stress that the Guarantees are enforceable obligations independent from the Sales Contracts. That may be true as a

---

[10] The Court agrees with SunOpta that Plaintiffs did not plead the 2015 Guarantee. In Plaintiffs' Complaint, Plaintiffs specifically referred to and attached the 2014 and 2016 Guarantees, but did not refer to or attach the 2015 Guarantee. (Dkt. 65 at 14-15, Exs. E and F). "[A]lthough a plaintiff generally can alter the legal theories asserted in its complaint, it cannot alter the factual basis of [its] complaint at summary judgment." *BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 900 F.3d 529, 541 (7th Cir. 2018) (internal citations and quotations omitted). Here, Plaintiffs are altering the factual basis of their complaint by arguing that they should prevail based on the 2015 Guarantee. The Guarantees are distinct documents, as Plaintiffs acknowledge (Dkt. 106 at 14), that apply to distinct time periods in the parties' relationship. Moving for summary judgment on the 2015 Guarantee changes Plaintiffs' factual theory. So Plaintiffs' theory of recovery based on the 2015 Guarantee would be forfeited anyway. *See ExxonMobil Oil Corp. v. Amex Constr. Co.*, 702 F. Supp. 2d 942 (N.D. Ill. 2010); *U.S. Bank Nat'l Ass'n v. Builders Bank*, 2011 U.S. Dist. LEXIS 31597, at *16 (N.D. Ill. Mar. 25, 2011).

general industry practice and the Court acknowledges that both parties recognize an important purpose of the Guarantees as providing TreeHouse protection from potential criminal penalties under the FDCA. But the Guarantees do not reference the Sales Contracts, do not purport to modify those contracts, and are not signed by both parties. Thus Plaintiffs cannot overcome the explicit requirement in the Sales Contracts that "[n]o…agreement purporting to modify or vary the terms of this contract shall be binding upon the parties unless the same shall be made in writing and signed by an authorized signatory of both parties."

And as to the warranty provision in the Guarantees, it essentially duplicates what is already in the SunOpta Specifications. Although the Sales Contracts do not contain a specific disclaimer of warranties, the Sales Contracts already incorporated express warranties by way of the Specifications. So it would be unreasonable to read the Sales Contracts as incorporating a warranty that is already part of their terms. A reasonable construction of these documents is that the Sales Contracts expressly incorporated the warranties of the SunOpta Specifications, but the merger clause did not permit the incorporation of any additional express warranties. *See* Minn. Stat. § 336.2-316(1). *See also Valley Paving, Inc.*, 2000 Minn. App. LEXIS 897, at *7 (merger clause sufficiently disclaimed any express warranty not provided for in agreement).[11]

For these reasons, SunOpta's motion on Count VIII is granted and Plaintiffs' motion is denied.

---

[11] Moreover, the requirement that a disclaimer of warranties be conspicuous applies to implied warranties only. Minn. Stat. § 336.2-316(2).

### III. SunOpta's Counterclaims

SunOpta moves for summary judgment on its counterclaim that TreeHouse's remedies are limited to the purchase price of the product because of the damages limitation provision in the Sales Contracts. (Dkt. 98 at 27). That provision states that SunOpta's "liability, whether contractual or otherwise, is exclusively limited to the purchase price of the product under all circumstances and regardless of the nature, cause or extent of the loss." (*Id.*) SunOpta requests a ruling as a matter of law that should TreeHouse prevail on any of its claims, its damages "are limited to provable damages up to the purchase price of products that tested positive for *LM*." (*Id.* at 28). Plaintiffs respond that the damages limitation provision fails of its essential purpose and is substantively unconscionable. (Dkt. 128 at 16, 23).

Minn. Stat. § 336.2-719 permits parties to agree to a limitation of remedies. Part 719(2) states that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this chapter." Minn. Stat. § 336.2-719(2). "An exclusive remedy fails of its essential purpose if circumstances arise to deprive the limiting clause of its meaning or one party of the substantial value of its bargain." *Valley Paving*, 2000 Minn. App. LEXIS 897, at *11. Plaintiffs argue that the damages limitation provision fails of its essential purpose because SunOpta contends the liability should be limited to $100,152 whereas Plaintiffs say their damages are $16,250,350. (Dkt. 128 at 23). But a remedy that does not cover all losses does not necessarily fail of its essential purpose. *See Taylor Inv. Corp. v. Weil*, 169 F. Supp. 2d 1046, 1059 (D. Minn. 2001). The Court finds, as explained below, that

there is no basis for limiting the damages to product actually contaminated with *LM,* but that does not mean that a remedy limited to the purchase price of the product fails of its essential purchase.

As to unconscionability, "[o]rdinarily, in addition to direct damages, incidental and consequential damages are available for breach of warranty. Parties to a contract may exclude incidental and consequential damages, but the limitations cannot be unconscionable… Unconscionability is a question of law." *Zutz v. Case Corp.*, 2006 U.S. Dist. LEXIS 10207, at *15-16 (D. Minn. Feb. 24, 2006) (citations omitted). As one court explained, applying Minnesota law,

> 'An exclusion of consequential damages set forth in advance in a commercial agreement between experienced business parties represents a bargained-for allocation of risk that is conscionable as a matter of law.' *Transport Corp. of Am. v. Int'l Bus. Mach. Inc.*, 30 F.3d 953, 960 (8th Cir. 1994) (applying Minnesota law). *See also Int'l Fin. Servs., Inc. v. Franz*, 534 N.W.2d 261, 269 (Minn. 1995) (holding that a consequential damages exclusion is not unconscionable when 'the parties were both merchants and there was no great disparity in their bargaining strength and where the claim is for commercial loss').

*Dave's Cabinets, Inc. v. Komo Mach., Inc.*, 2006 U.S. Dist. LEXIS 46263, at *10-11 (D. Minn. July 6, 2006). *See also Transp. Corp. of Am.*, 30 F.3d at 960 ("An exclusion of consequential damages set forth in advance in a commercial agreement between experienced business parties represents a bargained-for allocation of risk that is conscionable as a matter of law.")

Plaintiffs rely on *Dakota Style* to argue that the provision here is unconscionable, but the court in *Dakota Style* did not make that determination as a matter of law. Instead it denied summary judgment to SunOpta because it had "not heard all

23

evidence as to the commercial setting, purpose and effect of the contracts at issue." 329 F. Supp. 3d at 811-12. Here, there is not such a lack of evidence preventing the Court from determining unconscionability. As in *Taylor*, where the court found the damages limitation to be conscionable and enforceable, here both parties are "relatively sophisticated businesses and the claim [] is for commercial loss." 169 F. Supp. 2d 1059. Plaintiffs do not argue that TreeHouse was an unsophisticated party or that there was uneven bargaining power between SunOpta and TreeHouse. Therefore the Court finds the damages limitation provision to be enforceable. *See Metro. Sports Facilities Com. v. Gen. Mills, Inc.*, 470 N.W.2d 118, 125 (Minn. 1991) (sophisticated parties "exercised their liberty of contract and now are accountable for the product of their negotiations.").

However the Court does not agree with SunOpta that the damages limitation provision in the Sales Contracts limits damages to the purchase price of products "that tested positive for *LM*." The provision limits damages to "the purchase price of the product"; it does not contain any further limitation or qualification. SunOpta does not dispute that it issued a Class 1 Recall for kernels produced from May 31, 2015 to April 21, 2016. (DSOF ¶¶ 5, 83). Therefore, if Plaintiffs are awarded damages at trial, those damages will be limited to the purchase price of all sunflower kernel purchased by TreeHouse from SunOpta that were subject to SunOpta's recall. Accordingly, SunOpta's summary judgment motion on its Counterclaim I is granted in part and denied in part.

24

As to its claims for breach of contract or unjust enrichment (Counterclaims II and III), SunOpta argues that Plaintiffs owes it at least $893,416 plus additional interest for products purchased but not paid for. (Dkt. 98 at 28). TreeHouse argues that it offset payment of $576,407, as it is permitted to do under the U.C.C. and notified SunOpta of the offset on July 1, 2016. (Dkt. 128 at 25). The Court agrees with TreeHouse. Under Minn. Stat. § 336.2-717, "[t]he buyer on notifying the seller of an intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract."

Because issues for the jury remain about whether SunOpta is liable to Plaintiffs for breach of express and implied warranties, the Court cannot find as a matter of law at this stage that Plaintiffs are liable to SunOpta for breach of contract or for unjust enrichment. SunOpta's summary judgment motion on its counterclaims for breach of contract or unjust enrichment are denied.

## IV.    Summary

In sum, Plaintiffs' partial summary judgment motion is denied. The Court rules as follows on SunOpta's motion for summary judgment:

- as to Count IV, the motion is granted on Plaintiffs' claim for breach of contract and breach of indemnity, but denied as to the portion of that claim based on breach of express warranties.
- as to Counts V and VI (breach of implied warranties), the motion is denied.
- as to Count VIII, the motion is granted.
- as to SunOpta's Counterclaim I (declaratory judgment), the motion is granted to declare that Plaintiffs' damages, if proven at trial, are limited to the purchase price of the product sold by SunOpta to TreeHouse that was subject to the recall. However, SunOpta's request to further limit this amount to product actually contaminated with *LM* is denied.
- as to Counterclaims II and III (breach of contract and unjust enrichment), the motion is denied.

## CONCLUSION

For the stated reasons, Plaintiffs' motion for summary judgment [105] is denied, and SunOpta's motion for summary judgment [93] is granted in part and denied in part.

E N T E R:

Dated: May 31, 2020

_____
MARY M. ROWLAND
United States District Judge

26